UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TERESA BASKETT,                    )
                                   )
                    Plaintiff,     )
                                   )
        v.                         )        No.  4:13CV2087 SPM
                                   )
CAROLYN W. COLVIN, Acting          )
Commissioner of Social Security,   )
                                   )
                    Defendant.     )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the Commissioner's final decision denying Teresa Baskett's application

for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C.

§§ 401, *et seq.*, and application for supplemental security income under Title XVI

of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters are pending before the

undersigned United States Magistrate Judge, with consent of the parties, pursuant

to 28 U.S.C. § 636(c).  Because the Commissioner's final decision is supported by

substantial evidence on the record as a whole, it is affirmed.

### I.  Procedural History

On March 6, 2013, the Social Security Administration denied plaintiff

Teresa Baskett's November 5, 2012, applications for disability insurance benefits

(DIB) and supplemental security income (SSI), in which she claimed she became disabled on August 15, 2011, because of back, shoulder, and knee pain; hand and wrist pain; seizures; and an eye condition. (Tr. 96-97, 100-04, 153-66, 189.) At plaintiff's request, a hearing was held before an administrative law judge (ALJ) on April 29, 2013, at which plaintiff and a vocational expert testified. (Tr. 23-65.) On July 22, 2013, the ALJ issued a decision denying plaintiff's claims for benefits, finding plaintiff able to perform work as it exists in significant numbers in the national economy. (Tr. 5-18.) On September 25, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-3.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing that his determination of plaintiff's mental residual functional capacity (RFC) is not supported by some medical evidence and indeed is contrary to substantial evidence on the record as a whole. Plaintiff also claims that the ALJ posed an inadequate hypothetical to the vocational expert given the inadequate nature of the RFC determination. For the reasons that follow, the ALJ did not err in his determination.[1]

--------

[1] The undersigned has reviewed the entirety of the administrative record in determining whether

**II.  Relevant Testimonial Evidence Before the ALJ**

A.     <u>Plaintiff's Testimony</u>

At the hearing on April 29, 2013, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was fifty years of age.  (Tr. 26.)  Plaintiff earned her GED and has an associate's degree in combination welding.  (Tr. 27.)

Plaintiff's Work History Report shows that plaintiff worked as a truck driver and laborer for Meyer Pallet and Container from October 1992 to May 2005.  From August 2000 to December 2006, plaintiff worked at various companies as a welder and/or fitter.  From January 2007 to May 2009, plaintiff worked as a welder/fitter at J.B. Marine Service.  (Tr. 244-45.)  Plaintiff testified that she was laid off from this job because of the poor economy.  (Tr. 30.)  Plaintiff then worked as a seasonal driver and deliverer for United Parcel Service (UPS) in December 2010. From August 8 to 11, 2011, plaintiff worked as a loader and package handler for UPS.  (Tr. 244.)

Plaintiff testified that she was currently unable to work because of her back, shoulders, neck, and being "in a world of confusion."  Plaintiff testified that she is

---

the Commissioner's adverse decision is supported by substantial evidence.  However, inasmuch as plaintiff challenges the decision only as it relates to the effects of her mental impairment and not as it relates to any physical impairment, the recitation of specific evidence in this Memorandum and Order is limited to only that evidence relating to the issues raised by plaintiff on this appeal.

able to concentrate when she is dealing with a person one-on-one, but is "at a loss" when "out in the real world." (Tr. 30-31.)

Plaintiff testified to a history of head injuries, with her most recent injury occurring in October 2012 when she twice fell off of a bike and hit the back of her head while not wearing a helmet. Plaintiff testified that she did not lose consciousness but was nauseous and had migraine headaches for three or four days. Plaintiff testified that she did not seek medical assistance because of being taught not to go an emergency room without insurance or money unless you are bleeding or dying. (Tr. 31.) Plaintiff testified that she also sustained a head injury the day before she started working at UPS in 2011. Plaintiff testified that she had difficulty concentrating during her training at UPS, that she made errors in her employment packet, and that her trainer commented that she looked confused during training. Plaintiff testified that she had an MRI and was cleared to return to work. (Tr. 32-33.) Plaintiff resigned from UPS for "personal reasons" after having become disoriented while driving to work and losing consciousness in a parking lot. (Tr. 34.) Plaintiff testified that she also sustained a head injury because of a fall in 2008 while at work. Plaintiff testified that she was wearing a hard hat at the time but experienced redness and swelling for four or five days. Plaintiff testified that she did not seek medical assistance because the emergency room told her that she was "probably fine" as long as she did not lose

consciousness. (Tr. 32.) Plaintiff testified that she also sustained head injuries as a result of physical abuse from which she lost consciousness. (Tr. 35.)

Plaintiff testified that increased stress and depression causes her to have migraine headaches, and that such episodes currently occur three or four times a year. Plaintiff testified that she used to experience such episodes once or twice a month during which time she would vomit throughout the day and recover the following day. Plaintiff testified that the episodes were mentally and physically draining and that she would lie still during them. (Tr. 36.)

Plaintiff testified that she is angry and depressed and feels overwhelmed and hopeless. Plaintiff is unable to sleep because of her depression. (Tr. 38, 40.) Plaintiff testified that she also procrastinates and has memory lapses when performing tasks. Plaintiff testified that simple household tasks, such as doing laundry or taking a shower, is like work. Plaintiff no longer showers or changes her clothes on a daily basis. (Tr. 38-39.) Plaintiff testified that she does not want to talk to anyone – even on the telephone. She does not want to be outside and will wait until dark to leave the house. (Tr. 48.) Plaintiff testified that she recently visited a counselor and was on a waiting list to see a psychiatrist. (Tr. 37.) Plaintiff currently takes Zoloft for her condition. (Tr. 40.)

Plaintiff testified that she last drank alcohol in 2002 and last used illegal substances in 1997. (Tr. 48.) Plaintiff testified that laboratory tests in November

2012 showed the presence of methamphetamine because she had taken pseudoephedrine for a sinus infection and also lived near a place where methamphetamine is cooked and she may have "breathed [it] in." Plaintiff also testified that the tests showed the presence of opiates or morphine because she had taken medication for her back that had been given to her by a friend. Plaintiff testified that she also takes a friend's medication to control her blood pressure and to keep her "head shut up." Plaintiff uses such non-prescribed medication on occasion if someone gives it to her. (Tr. 49-50.)

As to her daily activities, plaintiff testified that she sits on the couch and writes. Plaintiff vacuums once or twice a month and keeps up with the laundry so that it does not pile up and become overwhelming. Plaintiff goes grocery shopping and tries to get "it all done" at one time so that she does not have to leave the house more often. Plaintiff does not lie down during the day because she does not want to stay awake all night. (Tr. 46-48.) Plaintiff is able to drive. (Tr. 45-46.)

B.    Testimony of Vocational Expert

Robin A. Cook, a vocational consultant, testified at the hearing in response to questions posed by the ALJ and counsel.

Ms. Cook classified plaintiff's past work as a welder and ship fitter as skilled and medium-to-heavy. (Tr. 54-56.)

The ALJ asked Ms. Cook to assume a person between the ages of forty-eight

and fifty, with a GED and an associate's degree in welding, and with the same work history as plaintiff. The ALJ asked Ms. Cook to further assume that the person was limited to light work with only frequent handling and fingering with both hands. Ms. Cook testified that such a person could perform work as an office helper at SVP level 2, of which 1,810 such jobs exist in the State of Missouri and 83,250 nationally; recreation aide at SVP level 2, of which 4,460 exist in the State of Missouri and 253,110 nationally; and tanning salon attendant at SVP level 2, of which 280 such jobs exist in the State of Missouri and 18,410 nationally. (Tr. 59.)

The ALJ asked Ms. Cook to assume the same individual but that she was further limited to unskilled work with simple, routine tasks. Ms. Cook testified that such a person could perform work as an office helper and tanning salon attendant, to which she previously testified. Ms. Cook testified that such a person could also perform work as housekeeper/cleaner at SVP level 2, of which 19,790 such jobs exist in the State of Missouri and 877,980 nationally. (Tr. 61.)

## IV.  Relevant Medical Evidence Before the ALJ

Plaintiff was admitted to the emergency room at St. Anthony's Medical Center on February 25, 2011, for treatment of respiratory failure and toxic exposure due to opiate overdose. Plaintiff was given Narcan drip. She left the hospital against medical advice without being seen by a physician. (Tr. 342-45.)

Plaintiff was admitted to the emergency room at Mercy Hospital on August

12, 2011, for examination after having recently been hit on the head by a tree limb. Plaintiff reported that she did not lose consciousness and had one episode of vomiting after the accident and was doing fine overall. Plaintiff reported that she had just started a new job and that her employer was requiring medical clearance before returning to work. Plaintiff denied any deficits but did complain that her brain was "scrambled." Neurological exam showed plaintiff to be alert and oriented times three. Plaintiff was noted to exhibit normal behavior. A CT scan of the head yielded normal results. Plaintiff was diagnosed with a closed head injury and released. (Tr. 252-63.)

On October 6, 2011, plaintiff underwent a routine, general medical examination for an intake assessment. Plaintiff was noted to be disheveled or unkempt. Plaintiff had no complaints. (Tr. 306.)

On March 14, 2012, plaintiff underwent a routine, general medical examination at Corrections Medicine, during which she reported no complaints. (Tr. 304.)

Plaintiff visited South County Health Center (SCHC) on August 1, 2012, with complaints of pain as well as complaints of being depressed from being unemployed for over three years. Plaintiff reported that she did not feel like herself. Plaintiff reported having sleep difficulties because her thoughts of failure and worry would not stop. Plaintiff also reported that she experienced migraine

headaches because of worry.  No treatment plan was discussed or put in place for any mental or emotional issues.  (Tr. 302-03.)

Plaintiff returned to SCHC on August 6, 2012, with complaints of joint pain. Plaintiff also continued to report feeling depressed.  Mental status examination was unremarkable.  No treatment plan was discussed or put in place for any mental or emotional issues.  (Tr. 297-300.)

Plaintiff visited SCHC on August 13, 2012, to establish a plan to stop smoking.  Plaintiff reported her smoking triggers to include stress and depression. Plaintiff reported that her health motivated her to quit smoking, noting specifically that she could not breathe and could not do her job at UPS.  A smoking cessation plan was put in place.  (Tr. 296.)

Plaintiff was admitted to the emergency room at St. Anthony's Medical Center on November 4, 2012, after having experienced a seizure while visiting friends at the hospital.  Plaintiff was currently experiencing nausea and vomiting. Plaintiff reported having hit her head after falling off of a bike two weeks prior and that she experienced increasing nausea and anxiousness since that time.  Plaintiff reported no other complaints.  A CT scan of the head was normal.  Laboratory testing yielded positive results for the presence of methamphetamine, benzodiazepines, and opiates/morphine.  It was opined that the seizure may have been brought on by the presence of methamphetamine.  Plaintiff was given Xanax

for anxiety in the emergency department. She was started on no medications since this was a first-time seizure. Plaintiff was instructed not to drive until cleared to do so by a neurologist. Plaintiff was discharged that same date in stable condition. (Tr. 315-41.)

On February 25, 2013, plaintiff underwent a consultative psychological evaluation for disability determinations. Plaintiff reported to Dr. Lloyd I. Moore that she had a history of physical and sexual abuse as a child. Plaintiff reported having last worked in August 2011 and that she quit that job for personal reasons after having passed out on her way to work due to what she thought was a seizure. Plaintiff reported that she currently stays at home, watches television, performs chores around the house, and visits with friends. Plaintiff reported not being socially active. Plaintiff reported a history of alcohol and drug use but that she had been sober since 2002. Plaintiff reported being arrested in March 2012 for illegally obtaining prescription medication and that she currently took her friends' prescribed medication on occasion for pain. Plaintiff reported having been hospitalized at age sixteen after having attempted suicide with her mother's medication. Plaintiff reported that she was also hospitalized in 1996 for depression. Plaintiff reported taking Zoloft in 1999, which appeared to help her, but that she was currently taking no psychotropic medication nor receiving any mental health care. Plaintiff reported having suicidal ideation but no intent.

Plaintiff reported her sleep and appetite to be poor. Mental status examination showed plaintiff to be clean but disheveled. Dr. Moore noted plaintiff to look sad. Plaintiff's affect was blunted and her mood appeared dysthymic. Plaintiff's thought processes and memory were intact. Plaintiff was oriented times three. Her fund of knowledge and simple calculations were good. Plaintiff's judgment and insight were likewise noted to be good. Plaintiff had difficulty repeating digits backward on immediate recall. Upon conclusion of the evaluation, Dr. Moore diagnosed plaintiff with major depressive disorder and personality disorder with obsessive compulsive traits. Dr. Moore assigned a GAF score of 60.[2] With respect to plaintiff's functional limitations, Dr. Moore opined that plaintiff was moderately impaired in the domain of Activities of Daily Living as well as in the domain of Concentration, Persistence, and Pace. In the domain of Social Functioning, Dr. Moore opined that plaintiff had a minor impairment. Dr. Moore opined that plaintiff could handle her own funds in her best interest. (Tr. 352-56.)

On February 28, 2013, Terry Dunn, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he opined that, since August 1, 2012, plaintiff's depressive syndrome and personality disorder caused mild difficulties in maintaining social functioning and

---

[2] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." *Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34* (4th ed. 2000). A GAF score of 51 to 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social,

moderate restrictions in activities of daily living and in concentration, persistence, or pace. Dr. Dunn reported there to be insufficient evidence of repeated episodes of decompensation. Dr. Dunn opined that plaintiff was capable of completing simple tasks. Dr. Dunn further opined that from August 15, 2011, to July 31, 2012, plaintiff had no medically determinable mental impairment. (Tr. 71-73, 86-88.) In a Mental RFC Assessment completed that same date, Dr. Dunn opined that in the domain of Understanding and Memory, plaintiff was moderately limited in her ability to understand and remember detailed instructions but was otherwise not significantly limited. In the domain of Sustained Concentration and Persistence, Dr. Dunn opined that plaintiff was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. In the domain of Social Interaction, Dr. Dunn opined that plaintiff was not significantly limited in any regard. Dr. Dunn concluded that plaintiff had the ability to understand and remember at least simple tasks. (Tr. 76-78, 91-93.)

Plaintiff visited SCHC on March 25, 2013, with complaints of feeling

---

occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

hopeless and helpless.  She reported taking a friend's Xanax for sleep and also taking Oxycodone.  Dr. Fred Rottnek noted that plaintiff's previous seizure activity could be due to her sporadic use of stimulants, benzo's, and opioids, and plaintiff agreed to stop buying controlled substances on the street.  Plaintiff requested that she be restarted on blood pressure medication because of an anticipated increase in blood pressure due to social stresses, including becoming homeless soon.  Plaintiff reported being "at the end of her rope."  It was noted that plaintiff had applied for disability.  Mental status examination showed plaintiff to be anxious, cooperative, and depressed.  Plaintiff was noted to be well groomed and in no acute distress.  Plaintiff was oriented times four and maintained adequate concentration and attention.  Plaintiff's affect, speech, thought content, perception, and cognitive function were all noted to be normal.  Dr. Rottnek diagnosed plaintiff as depressed and prescribed Sertraline (Zoloft).  Plaintiff was referred to a social worker for information regarding support groups, housing, and occupations.  (Tr. 377-78.)

On April 4, 2013, plaintiff visited LCSW Nicole M. Swanson at SCHC who noted plaintiff's history of stress and depression.  Plaintiff reported having hopeless, racing, and negative thoughts.  Plaintiff reported her partner, with whom she lived, to be chronically ill.  Ms. Swanson noted plaintiff's mood to be okay and her affect a little flat.  Plaintiff was noted to be open to counseling.  Plaintiff was placed on a waiting list for Psychiatry and was encouraged to follow up with the

YWCA for counseling services.  (Tr. 373.)

Plaintiff returned to Dr. Rottnek on April 15, 2013, who noted plaintiff to be upset and tearful regarding the upcoming disability hearing.  Plaintiff reported that she was compliant with taking Sertraline and that she would like to follow up with SCHC regularly until she could be seen by Psychiatry.  Mental status examination was unchanged from the last visit.  Plaintiff was continued on her current treatment regimen.  (Tr. 371-72.)

On April 18, 2013, plaintiff met with Quandra Chaffers, MSW, LMSW, at the YWCA Women's Resource Center to establish mental health services.  (Tr. 380.)  In a treatment plan dated June 5, 2013, Ms. Chaffers noted plaintiff's diagnosis to be major depressive disorder, recurrent, severe, and that she was taking no antidepressants.  A GAF score of 49 was assigned.[3]  Ms. Chaffers noted that multiple therapeutic techniques would be utilized, with an anticipated completion/discharge date of December 2013.  (Tr. 381-82.)

## V.  The ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social Security Act through March 31, 2015.  The ALJ found that plaintiff had not engaged in substantial gainful activity since August 15, 2011, the alleged onset

---

[3] A GAF score of 41-50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

date of disability.  The ALJ found plaintiff's mechanical low back pain, osteoarthritis of the dominant right thumb, major depression (recurrent), personality disorder, and substance abuse to be severe impairments, but that they did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ found plaintiff to have the RFC to perform light work except that she could perform only frequent handling and fingering with both hands, and was limited to unskilled work with simple, routine tasks.  The ALJ found plaintiff unable to perform any of her past relevant work.  Considering plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that plaintiff could perform other work existing in significant numbers in the national economy, and specifically, officer helper, tanning salon attendant, and housekeeper/cleaner.  The ALJ thus found that plaintiff was not under a disability from August 15, 2011, through the date of the decision.  (Tr. 10-18.)

## VI.  Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant

can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.  *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff contends that the ALJ's mental RFC assessment – that plaintiff can perform unskilled work with simple, repetitive tasks – is not based upon some

medical evidence of record and indeed is contrary to substantial evidence on the record as a whole. For the following reasons, the ALJ did not err in determining plaintiff's mental RFC.

A claimant's RFC represents the most she can do despite her physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. *Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). Because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC determination. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Eichelberger*, 390 F.3d at 591; *Hutsell v. Massanari*, 259 F.3d 707, 711-12 (8th Cir. 2001). Accordingly, the ALJ must "consider at least some supporting evidence from a [medical professional]" and should obtain medical evidence that addresses the claimant's ability to function in the workplace. *Hutsell*, 259 F.3d at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. *Id.* It is the claimant's burden, however, and not the Commissioner's, to prove the claimant's

RFC. *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003).

Here, contrary to plaintiff's assertion, the ALJ relied upon and discussed the medical evidence of record to support his RFC finding that plaintiff could perform unskilled work with simple, routine tasks. The ALJ discussed the findings from Dr. Moore's consultative examination – and specifically that plaintiff had mild limitations in social functioning and moderate limitations in activities of daily living and in concentration, persistence, or pace – and cited to other evidence of record that supported these findings, including mental status examinations that yielded essentially normal results. (*See* Tr. 11, 14-15.) *Cf. Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (ALJ's finding that claimant's mental impairment was not severe was supported by medical evidence that plaintiff exhibited normal judgment, recall, comprehension, behavior, and calculation). The ALJ also specifically referred to Dr. Dunn's and Dr. Moore's opinions that plaintiff was moderately limited in concentration, persistence, or pace and determined that, because of such limitation, plaintiff could perform only unskilled work with simple, repetitive tasks. (Tr. 13.) This mental RFC limitation adequately captures plaintiff's defined deficiencies in concentration, persistence, or pace. *See Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) (limitation to simple, routine, repetitive work adequately captures claimant's deficiencies in concentration, persistence, or pace where claimant was found to "often" have such deficiencies

but capable of doing simple, repetitive, and routine tasks).  Notably, plaintiff does not identify or elaborate upon any limitations she claims should have been, but were not included in the ALJ's mental RFC assessment.  Nor does she present any argument demonstrating that she suffers restrictions more limiting than as determined by the ALJ and posed to the vocational expert in the hypothetical.  *Cf. Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008) (claimant did not identify what limitations were missing from the hypothetical).  A diagnosis of a mental impairment does not in itself equate with a finding that the impairment causes significant limitations.  *Buckner v. Astrue*, 646 F.3d 549, 557 (8th Cir. 2011).

To the extent the treatment plan completed by Ms. Chaffers includes a GAF score indicating serious symptoms, the ALJ properly noted that other substantial evidence of record did not support such severe limitations in functioning.  A GAF score indicating serious symptoms need not be relied upon when it appears to be extreme in light of other substantial evidence.  *Juszczyk v. Astrue*, 542 F.3d 626, 632-33 (8th Cir. 2008); *cf. Hudson ex rel. Jones v. Barnhart,* 345 F.3d 661, 666-67 (8th Cir. 2003) (ALJ does not err in according less weight to low GAF scores where evidence shows scores not to reflect claimant's actual abilities).

A review of the ALJ's decision shows him to have conducted a thorough and independent review of all the medical and other evidence of record in determining plaintiff's mental RFC.  Because the ALJ's RFC determination that plaintiff was

limited to unskilled work with simple, routine tasks is based upon some medical evidence of record and is supported by substantial evidence on the record as a whole, it must be affirmed. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023-24 (8th Cir. 2002). This is so even if, as plaintiff argues, some evidence supports a contrary conclusion. *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010).

To the extent plaintiff challenges the hypothetical question posed to the vocational expert, she bases her claim only on her argument set out above that the ALJ's mental RFC assessment was not based on some medical evidence of record and thus that the hypothetical was based on a flawed mental RFC. For the reasons stated *supra*, the ALJ did not err in determining plaintiff's mental RFC. Plaintiff's corresponding challenge to the hypothetical question therefore fails.

Accordingly, for the reasons set out above on the claims raised by plaintiff on this appeal,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is **AFFIRMED**, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of October, 2014